1
2
3
4 UNITED STATES DISTRICT COURT
5 NORTHERN DISTRICT OF CALIFORNIA
6
7 MARKELL POOL,                           Case No. 19-cv-01005-EMC
8              Plaintiff,
                                          **ORDER GRANTING PLAINTIFF'S**
9        v.                               **MOTION TO REMAND**
10 F. HOFFMAN-LA ROCHE, LTD., et al.,     Docket No. 31
11              Defendants.
12
13
14        Plaintiff Markell Pool initiated this lawsuit in state court against the following defendants:

15        (1) F. Hoffman-La Roche Ltd. ("FHLR").

16        (2) Hoffman-La Roche, Inc. ("HLR").

17        (3) Roche Laboratories, Inc. ("Roche Labs").

18        (4) Genentech, Inc.

19        (5) Genentech USA, Inc. ("Genentech USA").

20 The first three defendants above shall hereinafter be referred to collectively as the "Roche

21 Defendants." The last two defendants shall hereinafter be referred to collectively as the

22 "Genentech Defendants." According to Mr. Pool, the Roche Defendants were responsible for

23 manufacturing, marketing, and/or selling an antimalarial drug known as Lariam but failed to

24 adequately warn about its toxic effects and thus are liable to him. He claims that the Genentech

25 Defendants are also liable based on a theory of successor liability.

26        After Mr. Pool filed suit, four of the five defendants – *i.e.*, all defendants except for FHLR

27 – removed the case to federal court. *See* Docket No. 1 (notice of removal). These four defendants

28 shall hereinafter be referred to as the "Removing Defendants." According to Removing

Defendants, removal was proper based on diversity jurisdiction, once the citizenship of the fraudulently joined defendants (*i.e.*, the Genentech Defendants) was ignored.

Following removal, all five defendants filed motions to quash and/or dismiss. *See* Docket No. 8 (FHLR's motion); Docket No. 10 (Genentech Defendants' motion); Docket No. 11 (HLR and Roche Labs' motion). Mr. Pool then filed a motion to remand, and the parties agreed that the motion to remand should be addressed before the five defendants' motions. *See* Docket No. 32 (stipulation and order). Currently pending before the Court is Mr. Pool's motion to remand.

Having considered the parties' briefs and accompanying submissions, as well as all other evidence of record, the Court hereby **GRANTS** the motion to remand.

## I.  FACTUAL & PROCEDURAL BACKGROUND

A.  General Allegations in Complaint

In his complaint, Mr. Pool alleges as follows.

Mr. Pool was previously part of the U.S. military. *See* Compl. ¶¶ 2, 14. The Roche Defendants "marketed and sold Lariam to the U.S. military for service members deployed to Somalia [in the 1990s] for the prevention of malaria." Compl. ¶ 2. Mr. Pool was deployed to Somalia during this time and took Lariam while there. *See* Compl. ¶ 3; *see also* Compl. ¶ 14.

Lariam is extremely toxic. *See* Compl. ¶ 1; *see also* Compl. ¶ 5 (alleging that, "after taking the drug, a sizeable group of soldier have severe and irreversible symptoms that mimic the symptoms of post-traumatic stress disorder"). The Roche Defendants knew of this fact at all relevant times, but hid the risks of the drug. *See* Compl. ¶ 4, 7. "As a result of [the] failure to warn [about the risks] and flawed drug design, [Mr. Pool] has suffered lasting neurological and psychiatric injuries." Compl. ¶ 3; *see also* Compl. ¶ 14 (describing effects on Mr. Pool).

In 2013, the FDA "slapped a 'blackbox' warning on the drug." FAC ¶ 11. "After the FDA warning, the U.S. military immediately changed its Lariam prescribing policies," "re-designating Lariam as a drug of last resort after other malaria prevention drugs were found to be ineffective." Compl. ¶ 12.

Mr. Pool seeks to hold the Roche Defendants liable because they were responsible for manufacturing, marketing, and/or selling Lariam. According to Mr. Pool:

- FHLR (a Swiss corporation) was the manufacturer of Lariam.  *See* Compl. ¶ 47.

- HLR (a New Jersey corporation) was the new drug application holder for Lariam, which made it "responsible for the labeling and packaging of Lariam in the United States."  Compl. ¶ 47.

- Roche Labs (a Delaware corporation) marketed and sold Lariam to the Department of Defense under a Distribution and Pricing Agreement (also known as a "DAPA").  *See* Compl. ¶ 48.

Mr. Pool seeks to hold the Genentech Defendants (both Delaware corporations) liable on a successor liability theory.  In 2009, Genentech was acquired by a Roche entity.  According to Mr. Pool, after the acquisition of Genentech in 2009, Roche Labs essentially transferred its "military-Lariam business" to the Genentech Defendants – *i.e.*, the Genentech Defendants "became the mere continuation of Roche Lab[s] with respect to the military-Lariam line of business."  Compl. ¶ 50.

Based on, *inter alia*, the above allegations, Mr. Pool has asserted the following causes of action:

(1) Strict products liability – failure to warn.

(2) Negligence.

(3) Deceit by concealment in violation of California Civil Code §§ 1709-10.

(4) Fraud.

(5) Negligent misrepresentation and concealment.

B.    Allegations in Complaint Related to Citizenship

As noted above, the Removing Defendants removed this case to federal court on the basis of diversity jurisdiction.  Thus, citizenship of the parties is a critical issue.

Mr. Pool is a citizen of California.  He alleges that most of the other defendants are also citizens of California (and thus there is not complete diversity), not because of their state of incorporation but rather because of their principal places of business.

For example, Mr. Pool alleges that HLR and Roche Labs both have their principal places of business in South San Francisco, California, and not Little Falls, New Jersey (as the Removing Defendants claim).

Mr. Pool also alleges that the Genentech Defendants have their principal places of business in South San Francisco – a fact that the Removing Defendants do not dispute. However, the Removing Defendants claim that the Genentech Defendants have been fraudulently joined to this case and thus their California citizenship should be disregarded.

## II.    DISCUSSION

A.    Legal Standard

Title 28 U.S.C. § 1441 provides in relevant part "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed." 28 U.S.C. § 1441(a). "A defendant may remove an action to federal court based on federal question jurisdiction or diversity jurisdiction. However, [i]t is to be presumed that a cause lies outside [the] limited jurisdiction [of the federal courts] and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1042 (9th Cir. 2009) (internal quotation marks omitted). Thus, in a removal situation, the defendant has the burden of proving jurisdiction, and the burden of proof is preponderance of the evidence. *See Geographic Expeditions, Inc. v. Estate of Lhotka*, 599 F.3d 1102, 1106-07 (9th Cir. 2010). "Federal jurisdiction must be rejected *if there is any doubt* as to the right of removal in the first instance." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) (emphasis added); *see also Hunter*, 582 F.3d at 1042 ("The '*strong presumption* against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper,' and that the court resolves all ambiguity in favor of remand to state court.") (emphasis added).

In light of the above, the Removing Defendants bear the burden of proving the diversity of citizenship between HLR/Roche Labs and Mr. Pool in the instant case. *See Sheets*, 2018 U.S. Dist. LEXIS 207248, at *9 (stating that "the burden with regard to citizenship rests with HLR [defendant], not Plaintiffs"); *see also Int'l Cultural Exch. Grp. v. Harifa, Inc.*, No. 5:14-cv-03014-PSG, 2014 U.S. Dist. LEXIS 152681, at *7 (N.D. Cal. Oct. 27, 2014) (stating that "there is no dispute that as the removing parties, Defendants bear the burden of proving the diversity of their citizenship from that of ICEG [plaintiff][;] Defendants do not dispute they bear this burden, nor do they dispute that this court must resolve all doubts as to the parties' diversity of citizenship in

favor of remand").

As for fraudulent joinder (as noted above, here, the Removing Defendants argue that the California citizenship of the Genentech Defendants may be disregarded because they were fraudulently joined to the lawsuit), the Ninth Circuit has noted that

> [t]here are two ways to establish fraudulent joinder: "(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court." *Hunter v. Phillip Morris USA*, 582 F.3d 1039, 1044 (9th Cir. 2009) . . . . Fraudulent joinder is established the second way if a defendant shows that an "individual[] joined in the action cannot be liable on any theory." *Ritchey v. Upjohn Drug Co*, 139 F.3d 1313, 1318 (9th Cir. 1998). But "if there is a *possibility* that a state court would find that the complaint states a cause of action against any of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court." *Hunter*, 582 F.3d at 1046 . . . . A defendant invoking federal court diversity jurisdiction on the basis of fraudulent joinder bears a "heavy burden" since there is a "general presumption against [finding] fraudulent joinder." *Id.* (citations omitted).
>
> We have upheld rulings of fraudulent joinder where a defendant demonstrates that a plaintiff is barred by the statute of limitations from bringing claims against that defendant. *See Ritchey*, 139 F.3d at 1320; *Hamilton Materials, Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1206 (9th Cir. 2007). We have also upheld such rulings where a defendant presents extraordinarily strong evidence or arguments that a plaintiff could not possibly prevail on her claims against the allegedly fraudulently joined defendant. *See McCabe v. Gen. Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir. 1987) (defendant's conduct was privileged under state law); *United Comput. Sys. Inc. v. AT&T Corp.*, 298 F.3d 756, 761 (9th Cir. 2002) (plaintiff's claims against alleged sham defendant were all predicated on a contract to which the defendant was not a party); *Kruso v. Int'l Tel. & Tel. Corp.*, 872 F.2d 1416, 1426-27 (9th Cir. 1989) (same). We have declined to uphold fraudulent joinder rulings where a defendant raises a  defense that requires a searching inquiry into the merits of the plaintiff's case, even if that defense, if successful, would prove fatal. *See Hunter*, 582 F.3d at 1046 (holding that an implied preemption affirmative defense was not a permissible ground for finding fraudulent joinder).

*GranCare, LLC v. Thrower*, 889 F.3d 543, 548-49 (9th Cir. 2018) (emphasis in original).

Notably, in *GranCare*, the Ninth Circuit underscored that a fraudulent joinder analysis is not the same as a 12(b)(6) analysis, although there are "some similarities." *Id.* at 549.

> A claim against a defendant may fail under Rule 12(b)(6), but that defendant has not necessarily been fraudulently joined. We emphasized in *Hunter* that a federal court must find that a defendant

was properly joined and remand the case to state court if there is a "*possibility* that a state court would find that the complaint states a cause of action against any of the [non-diverse] defendants." *Hunter*, 582 F.3d at 1046 (emphasis added) (internal quotations and citation omitted) . . . . This standard accords with that adopted by a majority of our sister circuits. . . .

A standard that equates fraudulent joinder with Rule 12(b)(6) conflates a jurisdictional inquiry with an adjudication on the merits. Because the purpose of the fraudulent joinder doctrine is to allow a determination whether the district court has subject matter jurisdiction, the standard is similar to the "wholly insubstantial and frivolous" standard for dismissing claims under Rule 12(b)(1) for lack of federal question jurisdiction. *Bell v. Hood*, 327 U.S. 678, 682-83, 66 S. Ct. 773, 90 L. Ed. 939 (1946); *Franklin v. Murphy*, 745 F.2d 1221, 1227 n.6 (9th Cir. 1984) ("A paid complaint that is 'obviously frivolous' does not confer federal subject matter jurisdiction."). The relative stringency of the standard accords with the presumption against removal jurisdiction, under which we "strictly construe the removal statute," and reject federal jurisdiction "if there is any doubt as to the right of removal in the first instance." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) (per curiam).

*Id.* at 549-50. In other cases, the Ninth Circuit has also held that "[f]raudulent joinder must be proven by *clear and convincing evidence*." *Hamilton Materials Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1206 (9th Cir. 2007) (emphasis added).

B.    Defect in Notice of Removal

As an initial matter, the Court addresses Mr. Pool's argument that the motion to remand can be easily granted because the Removing Defendants' notice of removal was defective. More specifically, Mr. Pool asserts that the notice failed to allege what the citizenship of Roche Labs was. Mr. Pool acknowledges that, about three weeks after the filing of the notice of removal, the Removing Defendants tried to cure this problem by filing a notice of errata and an amended notice of removal. *See* Docket No. 22 (notices). But Mr. Pool argues that this attempt to cure should be rejected because it was tendered outside of the removal period (*i.e.*, outside the "30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based").[1] 28 U.S.C. § 1446(b).

Mr. Pool is correct that the original notice of removal failed to address the citizenship of

---

[1] In terms of timing, the complaint was served on the Removing Defendants on January 23, 2019. The Removing Defendants removed on February 22, 2019. The Removing Defendants then filed their notice of errata and amended notice of removal on March 12, 2019.

Roche Labs.  But he is incorrect that a defective allegation of jurisdiction cannot be cured.  Title

28 U.S.C. § 1653 provides: "Defective allegations of jurisdiction may be amended, upon terms, in

the trial or appellate courts."  28 U.S.C. § 1653.  And the main case on which Mr. Pool relies –

*Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001) – specifically noted that § 1653

allows for the curing of defective allegations regarding citizenship.  *See id.* at 857-58 (noting that

the defendant had failed to specify what the plaintiffs' state citizenship was, instead only referring

to their state residence, but adding that the defendant "could potentially have cured its defective

allegations regarding citizenship by amending its notice of removal") (citing § 1653).

Furthermore, the district court cases that Mr. Pool cites all fail to address § 1653.

To the extent Mr. Pool suggests that a defect may be cured only within the thirty-day

period for removing a case to federal court, he is also incorrect.  He does have a district court case

to support his position (although, as noted above, that case failed to discuss § 1653).  *See*

*Contreras v. BMS of N. Am., LLC*, No. CV 18-8014 PA (MAAx), 2018 U.S. Dist. LEXIS 172828,

at *5 (C.D. Cal. Oct. 18, 2018) (noting that defendant failed to allege its own citizenship; although

defendant filed an amended notice of removal, it was filed "*after* the Court had already identified

the defect in the original Notice of Removal and more than 30 days after [the defendant] was

served with the Summons and Complaint" and thus concluding that "the Amended Notice of

Removal does not cure the procedural defect in the original Notice of Removal") (emphasis in

original).  But § 1653 on its face does not put any time limits on amendment, and, as the Moore's

treatise notes, "[s]ection 1653's liberal amendment rule permits a party who has not alleged that

diversity exists to amend the pleadings *even as late as on appeal*."  15A Moore's Fed. Prac. – Civ.

§ 102.17[a] (emphasis added).  In addition, the Ninth Circuit has indicated that an amendment

after the thirty-day period is permissible:

> A defendant seeking to remove a case to federal court must do so
> within thirty days of being served with the complaint.  *See* 28 U.S.C.
> § 1446(b).  The Notice of Removal "cannot be amended to add a
> separate basis for removal jurisdiction after the thirty day period."
> *O'Halloran v. University of Washington*, 856 F.2d 1375, 1381 (9th
> Cir. 1988).  *However, a defendant may amend the Notice of
> Removal after the thirty day window has closed to correct a
> "defective allegation of jurisdiction."  See* 28 U.S.C. § 1653; *see
> also* 16 Moore's Federal Practice § 107.30[2][a][iv] ("Amendment

may be permitted after the 30-day period if the amendment corrects defective allegations of jurisdiction, but not to add a new basis for removal jurisdiction.").

*ARCO Envtl. Remed., L.L.C. v. Dep't of Health & Envtl. Quality*, 213 F.3d 1108, 1117 (9th Cir. 2000) (emphasis added).

Accordingly, the notice of removal was not procedurally defective.

C.    Genentech Defendants and Successor Liability

Although the defect in the removal notice is curable, Mr. Pool ultimately prevails on the merits on his motion to remand. The Court addresses first the issue of whether the Genentech Defendants – who are undisputedly California citizens – were fraudulently joined to this lawsuit.

As noted above, Mr. Pool maintains that the Genentech Defendants are liable based on a successor liability theory. The main case on which Mr. Pool relies with respect to successor liability is *Cleveland v. Johnson*, 209 Cal. App. 4th 1315, 1327 (2012). In *Cleveland*, the plaintiffs were two individuals who entered into an agreement with a company, ISI, under which the plaintiffs would provide $75,000 in capital to ISI so that it could develop a new business (an Internet service provider) to be known as The Central Connection. In turn, the plaintiffs were to receive 100% of the net cash receipts from the Internet project until all capital invested had been recouped; after that, the plaintiffs were to be paid 5% of gross receipts from the project. *See id.* at 1320.

Several years after entering into the agreement, the plaintiffs were told that the Internet project failed. *See id.* at 1321. However, the plaintiffs later discovered that the president of ISI had set up a business known as IS West that was similar to The Central Connection; IS West was a lucrative business. *See id.* at 1324. The plaintiffs thus filed suit, claiming that there was "a design and scheme 'to hijack the internet service provider business enterprise then known as Central Connection [now known as IS West], for [defendants'] own use and profit without the burden of the obligations owed to [the plaintiff].'" *Id.* The plaintiffs sued both the ISI president and IS West itself. According to the plaintiffs, IS West was liable for breach of contract because, *inter alia*, it was the successor to ISI. *See id.* More specifically, the plaintiffs argued that "IS West was the successor of ISI 'dba The Central Connection,' *not* ISI as a corporate entity." *Id.* at 1326

8

1     (emphasis added). A jury found in favor of the plaintiffs on the successor liability theory. *See id.*

2     at 1325.

3        On appeal, the defendants contested the successor liability theory. The court rejected the

4     defendants' argument:

> Defendants can prevail in this case only if, as a matter of law, there can never be successor liability when a corporation takes over a specific line of business that was operated separately by another corporation – that is where, as here, the assets of a separately maintained business or division (The Central Connection) of a company (ISI) are transferred to a new company (IS West). Where there may be circumstances under which successor liability in that situation would be in appropriate, that conclusion does not follow as a matter of law. Here, the facts were sufficient to support successor liability.

11     *Id.* at 1326.

12        The court explained that, for purposes of successor liability,

> "the purchaser does not assume the seller's liabilities unless (1) there is an express or implied agreement of assumption, (2), the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts."

17     *Id.* at 1327.

18        For the third successor liability theory above – *i.e.*, the mere continuation theory, "it has

19     long been held that 'corporations cannot escape liability by a mere change of name or a shift of

20     assets when and where it is shown that the new corporation is, in reality, but a continuation of the

21     old.'" *Id.*

> Further, *Ray v. Alad* [19 Cal. 3d 22 (1977)] tells us, " . . . California decisions holding that a corporation acquiring the assets of another corporation is the latter's mere continuation and therefore liable for its debts have imposed such liability only upon a showing of *one or both* of the following factual elements: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations."

*Id.* (emphasis in original).[2]

The court went on to note that the jury was instructed on the mere continuation theory and the question before it was essentially "one of law: may the doctrine of successor liability be applied to a corporation that succeeds to the assets of an unincorporated, but clearly separate, line of business of another corporation?" *Id.* at 1328. According to the court, "[w]e see no reason why the doctrine of successor liability should not be applied, and defendants offer no case law expressly forbidding its application." *Id.* Indeed, there was case law to support the application of successor liability – recognizing, for example, that "recognition of the fiction of separate corporate existence [as opposed to continuation] would foster an injustice or further a fraud." *Id.*

> These cases establish that the principles underlying the "mere continuation" theory of successor liability are not confined to corporations. A corporation may be a "mere continuation" of a partnership . . . . The very similar principles of alter ego liability will be applied where "the recognition of the fiction of separate corporate existence would foster an injustice or further a fraud . . . ."

*Id.* at 1329.

The court also rejected the defendants' argument that successor liability should not apply because "doing business under a fictitious business name [*i.e.*, The Central Connection] does not create a separate legal entity" from ISI. *Id.* at 1330. The court explained that

> [s]uccessor liability issues are equitable issues to be examined "on their own unique facts," and defendants offer no authority for the proposition that it "is simply a legal impossibility" for IS West to be the successor of ISI doing business as The Central Connection. *In short, the controlling point is that successor liability, like alter ego and similar principles, is an equitable doctrine.* As with other equitable doctrines, "it is appropriate to examine successor liability issues on their own unique facts" and "[c]onsiderations of fairness and equity apply." On the facts established in this case, we see no basis to conclude that, as a matter of law, a corporation (IS West) may not be found to be a "mere continuation" of a separately operated line of business (ISI doing business as The Central Connection).

_____

[2] *See also Cleveland*, 209 Cal. App. 4th at 1334 ("The significant principle is that if a corporation organizes another corporation with practically the same shareholders and directors, transfers all the assets but does not pay all the first corporation's debts, and continues to carry on the same business, the separate entities may be disregarded and the new corporation held liable for the obligations of the old.") (internal quotation marks omitted).

Defendants refer us to several cases they say support the proposition that a corporation like IS West "cannot be subjected to 'successor' liability where the seller [(ISI)] retained its separate corporate identity and continued to operate after the asset transfer." But this claim, too, presupposes the point we have just rejected: the assertion that there can never be successor liability as between a separately operated division of a company and a new corporation. The equitable principles we have described compel rejection of that assertion under the circumstances of this case.

*Id.* at 1330-31 (emphasis added). *Compare Garcia v. New Albertson's, Inc.*, No. 2:13-CV-05941-CAS (JCGx), 2014 U.S. Dist. LEXIS 142422, at *38 (C.D. Cal. Oct. 3, 2014) (stating that "[c]omparable equitable considerations are absent here[;] [u]nlike in *Cleveland*, the entity that allegedly wronged plaintiff is an active company that retains most of its pre-sale assets, easily sufficient to satisfy a judgment for plaintiff").

In his complaint, Mr. Pool makes allegations that map the legal landscape on the successor liability/mere continuation theory laid out in *Cleveland*. To wit:

> 47. At all relevant times, [FHLR] was the manufacturer of Lariam. At all relevant times, [HLR] was the new drug application holder, rendering it responsible for the labeling and packaging of Lariam in the United States.

> 48. Before the acquisition of Genentech by the Roche Group, Roche Lab[s] [a subsidiary of HLR] marketed and sold Lariam to the Department of Defense under a Distribution and Pricing Agreement ("DAPA"). A DAPA obligated Roche Lab[s] to offer Lariam for sale to the Defense Logistics Agency ("DLA") at the prices set forth in the DAPA. Roche did in fact sell Lariam to the military under these agreements up until the Genentech acquisition in or around 2009. . . .

> . . . .

> 50. After the Genentech acquisition, Roche Lab[s] transferred the military-Lariam business to Genentech USA and Genentech USA became the mere continuation of Roche Lab[s] with respect to the military-Lariam line of business. *At that time, Roche Lab[s] had terminated or withdrawn from its DAPA agreement to offer Lariam for sale to the U.S. military. Concurrently therewith, Genentech USA succeeded to the DAPA agreement and became the official DAPA holder of Lariam for the Roche Group*, meaning Genentech USA was the only entity in the Roche Group capable of offering Lariam for sale to the U.S. military.

> 51. *Genentech USA paid Roche Lab[s] nothing for the military-Lariam line of business. It gave Roche Lab[s] no consideration for this line of business. Moreover, Genentech USA had a common stock holder with Roche Lab[s] . . . . [Both] entities were owned by*

*Roche Holdings, Inc. [And] Genentech USA had common officers and directors with Roche Lab[s] . . . at all relevant times.* In sum, Genentech USA was a mere continuation and thus successor of Roche Lab[s] with respect to the military-Lariam line of business, and the military was the single largest customer of Lariam for the Roche Group.

Compl. ¶¶ 47-51 (emphasis added).

Given these allegations in the complaint, it is possible that a state court would find in Mr. Pool's favor on the successor liability/mere continuation theory, and therefore remand is appropriate. *See GranCare*, 889 F.3d at 548-49 (emphasizing that, "'if there is a *possibility* that a state court would find that the complaint states a cause of action against any of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court'") (emphasis in original).

The Removing Defendants' arguments to the contrary are not persuasive. For example, the Removing Defendants assert that there can be no successor liability where the predecessor company (here, HLR and/or Roche Labs) still exists. But *Cleveland* indicates otherwise – *i.e.*, there, only a line of business was transferred from ISI to IS West, but the court still considered the possibility of successor liability.

The Removing Defendants also make much of the fact that the Genentech Defendants never sold Lariam. *See, e.g.*, Docket No. 1-4 (Gray Decl. ¶¶ 2-3) (testifying that "[t]he last lots of Lariam for U.S. distribution were manufactured in December of 2005" and that the last lots "expired in December 2008," *i.e.*, before Genentech was acquired in 2009); Docket No. 1-3 (letter, dated February 2019, from Defense Logistics Agency, in response to a FOIA request, stating that "the product [Lariam] was no longer purchased after September 2008," *i.e.*, before Genentech was acquired in 2009)[3]; Docket No. 1-5 (Bohm Decl. ¶ 17) (testifying that HLR voluntarily applied to withdraw its new drug application for Lariam in June 2009). But that fact is immaterial because Mr. Pool is not seeking to hold the Genentech Defendants liable on a direct liability theory; rather, he is claiming only successor liability. The Removing Defendants have failed to show that the

---

[3] Mr. Pool has objected to this evidence. However, the objection is essentially moot because, even taking the evidence into account, the Court ultimately finds in Mr. Pool's favor on the merits of the remand motion.

1    Genentech Defendants could not be held liable for their predecessors' conduct with respect to

2    Lariam.

3            Finally, the Removing Defendants maintain that "the facts of the instant case are so far

4    removed from those present in *Cleveland* that successor liability cannot, as a matter of fact and

5    law, be applied." Opp'n at 17. But *Cleveland* explains that successor liability is ultimately about

6    equity. Here, it is possible that a state court could find, as an equitable matter, that the Genentech

7    Defendants should have successor liability because the relevant Roche parent made a decision to

8    spin off HLR or Roche Labs' commercial operations – or at least the military line of business –

9    into the Genentech Defendants without adequate consideration being given to HLR or Roche

10   Labs. The Removing Defendants argue that successor liability makes no sense here because Mr.

11   Pool is "attempt[ing] to apply the reverse of successor liability (i.e., he attempts to impute liability

12   to the *purchased* corporation [Genentech]), whereas successor liability imputes the liability of the

13   purchased corporation to the *purchasing* corporation [a Roche entity]." Opp'n at 17 (emphasis

14   added). Although, as a formal matter, a Roche entity acquired Genentech, that does not preclude

15   Genentech succeeding to liability of, *e.g.*, HLR or Roche Labs. The critical question is whether a

16   Genentech Defendant is in effect a mere continuation of HLR or Roche Labs. *See also Cleveland*,

17   209 Cal. App. 4th at 1327 (acknowledging that, "[h]ere, we do not have one corporation formally

18   purchasing the assets of another corporation"; but there are "'California decisions holding that a

19   corporation acquiring the assets of another corporation is the latter's mere continuation and

20   therefore liable for its debts").

21           That a Genentech Defendant could be a mere continuation is suggested by not only the

22   allegations in the complaint but also by evidence submitted by Mr. Pool. More specifically, Mr.

23   Pool has offered evidence indicating that a Roche parent made a purposeful decision to spin off

24   HLR/Roche Labs' commercial operations to a Genentech entity in South San Francisco. For

25   example:

26           •    A document found on the www.roche.com website, dated February 9, 2009, and

27                titled "Bringing a successful partnership to the next level." The document

28                addresses the acquisition of Genentech by a Roche entity. *See* Creed Decl., Ex. 1

13

(Document at 3) ("Roche makes a tender offer to acquire all publicly held shares in Genentech."). The document states that there will be "[r]eloc[ation] [of] commercial headquarters to South San Francisco by combining marketing and support services." Creed Decl., Ex. 1 (Document at 18). The document also states that there will be "[c]onsolidat[ion] [of] HQ functions in South San Francisco." Creed Decl., Ex. 1 (Document at 18).

- A message dated August 23, 2018, to Genentech employees from Roche Chairman Franz Humer and Roche CEO Severin Schwan. The message states: "We remain committed to maintaining the Genentech brand name in the U.S. and locating the combined company's U.S. headquarters at Genentech's current facility in South San Francisco." Creed Decl., Ex. 3 (Message at 1).

- A webpage available on the www.roche.com website, titled "tale of two sites." The webpage discusses employees working in Basel, Switzerland, and San Francisco. It states: "Basel is home to the Roche company headquarters; South San Francisco to Genentech, the US headquarters." Creed Decl., Ex. 7 (Webpage at 2). The webpage also states: "The Genentech site in California, Roche's North America hub, . . . also serves as the headquarters of Roche Commercial Operations for North America." Creed Decl., Ex. 7 (Webpage at 2).

- A document found on the www.roche.com website, dated April 14, 2009, and titled "Investor Update." The update states: "Pascal Soriot will be appointed as CEO Genentech. In his new role he will lead all Pharma activities in the US and report directly to Group CEO Severin Schwan. . . . [¶] [T]he combined commercial operations of Roche Pharma North America and Genentech will be headquartered in South San Francisco. Pascal Soriot will directly lead this function." Creed Decl., Ex. 21 (Update at 1-2). The update continues: "George Abercrombie, CEO and President of [HLR], has agreed to support the integration through the end of 2009. In this role he will assist Pascal Soriot with the transition of the US Commercial Headquarters from Nutley [New Jersey] to South San Francisco."

Creed Decl., Ex. 21 (Update at 2).

- A webpage found on the website www.roche-nutley.com. The webpage states: "The former [HLR] site in Nutley, NJ, was sold in 2016 and is no longer operational. THIS WEBSITE IS ONLY ABOUT THE ENVIRONMENTAL REMEDIATION OF THE FORMER ROCHE NUTLEY SITE. . . . [¶] For all other information, use the following contacts. ROCHE PHARMACEUTICAL INQUIRIES: Roche's North American pharmaceutical headquarters is Genentech in South San Francisco." Creed Decl., Ex. 22 (Webpage at 1).

The Removing Defendants protest that the above evidence is hearsay. *Cf. M.E.S., Inc. v. Snell*, 712 F.3d 666, 671 (2d Cir. 2013) (stating that, where a defendant files a Rule 12(b)(1) motion to dismiss, a court is "permitted to rely on non-conclusory, non-hearsay statements outside the pleadings"). This argument lacks merit. Mr. Pool has raised at least a potentially meritorious argument that the evidence is not hearsay – *i.e.*, because the evidence comes from a Roche parent website, it amounts to a party admission or at least has sufficient indicia of reliability to fall within the residual exception to the hearsay rule. *See* Fed. R. Evid. 801(d)(2), 807. Defendants fail to negate the possibility that a state court could find successor liability. Notably, defense counsel conceded at the argument that HLR now only has but three employees and that at least some of its operational functions were taken over by a Genentech entity. There is thus a substantial basis from which a state court might infer successor liability.

Accordingly, the Court holds that, because the Removing Defendants have failed to carry its heavy burden of proving that the Genentech Defendants were fraudulently joined, there is no diversity of citizenship and thus removal of the instant case was not proper.

D.    Citizenship of HLR and Roches Labs

There is a second, independent basis that also supports remand. More specifically, the Removing Defendants have failed to meet their burden of showing that HLR and La Roche are not citizens of California. Or, to state the matter somewhat differently, the Removing Defendants have failed to establish that the principal places of business for the two companies are in Little Falls, New Jersey.

1.  <u>Supreme Court's *Hertz* Decision</u>

In evaluating what are the principal places of business for HLR and Roche Labs, the Court first takes into account the Supreme Court's decision *Hertz Corp. v. Friend*, 559 U.S. 77 (2010). There, the Supreme Court addressed the definition of "principal place of business" as used in the diversity jurisdiction statute, 28 U.S.C. § 1332. The Court stated, in relevant part, that

> we place primary weight upon the need for judicial administration of a jurisdictional statute to remain as simple as possible. And we conclude that the phrase "principal place of business" refers to the place *where the corporation's high level officers direct, control, and coordinate the corporation's activities*. Lower federal courts have often metaphorically called that place the corporation's "*nerve center*."

*Id.* at 80-81 (emphasis added). The Court added that, "in practice," the nerve center

> should normally be the place where the corporation maintains its headquarters – provided that the headquarters is the actual center of direction, control, and coordination, . . . and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).

*Id.* at 93.

Notably, the Supreme Court rejected the proposition that a corporation's principal place of business is determined by "the amount of a corporation's business activity State by State" – *i.e.*, "[i]f the amount of activity is significantly larger or substantially predominates in one State, then that State is the corporation's principal place of business" and, only "[i]f there is no such State, then the principal place of business is the corporation's nerve center, *i.e.*, the place where the majority of its executive and administrative functions are performed." *Id.* at 82. This was, relatively speaking, too complicated an approach. *See id.* at 90 (noting that "a general 'business activities' approach has proved unusually difficult to apply" – *e.g.*, "[c]ourts must decide which factors are more important than others: for example, plant location, sales or servicing centers; transactions, payrolls, or revenue generation"); *id.* at 94 (noting that a "more general business activities test" "invites greater litigation and can lead to strange results" – *e.g.*, "if a corporation may be deemed a citizen of California on th[e] basis of activities [that] roughly reflect California's larger population . . . nearly every national retailer – no matter how far flung its operations – will

16

be deemed a citizen of California for diversity purposes") (internal quotation marks omitted).

The Supreme Court acknowledged "there will be hard cases" even under the nerve center test – *e.g.*, "in this era of telecommuting, *some corporations may divide their command and coordinating functions among officers who work at several different locations*, perhaps communicating over the Internet"; nevertheless, the Court still found the nerve center test more appropriate than the more general business activities test:

> [O]ur test . . . points courts in a single direction, toward the center of overall direction, control, and coordination. Courts do not have to try to weigh corporate functions, assets, or revenues different in kind, one from the other. Our approach provides a sensible test that is relatively easier to apply, not a test that will, in all instances, automatically generate a result.

*Id.* at 96 (emphasis added).

The Supreme Court also

> recognize[d] that the use of a "nerve center" test may in some cases produce results that seem to cut against the basic rationale for 28 U.S.C. § 1332 [*i.e.*, protecting out-of-state defendants from local prejudice]. For example, if the bulk of a company's business activities visible to the public take place in New Jersey, while its top officers direct those activities just across the river in New York, the "principal place of business" is [still] New York. One could argue that members of the public in New Jersey would be *less* likely to be prejudiced against the corporation than persons in New York – yet the corporation will still be entitled to remove a New Jersey state court to federal court. And note too that the same corporation would be unable to remove a New York state case to federal court, despite the New York public's presumed prejudice against the corporation.

*Id.* (emphasis in original). But, it explained, "in view of the necessity of having a clearer rule, we must accept [such anomalies]." *Id.*

Finally, the Court concluded by pointing out that its nerve center test should not be misconstrued to allow for manipulation of jurisdiction. For example, "we reject suggestions [that] the mere filing of a form like the Securities and Exchange Commission's Form 10-K listing a corporation's 'principal executive offices' would, without more, be sufficient proof to establish a corporation's 'nerve center.'" *Id.* at 97. Also, "if the record reveals . . . that the alleged 'nerve center' is nothing more than a mail drop box, a bare office with a computer, or the location of an annual retreat," that would not be sufficient to establish the principal place of business. *Id.*

17

2. <u>Judge Tigar's *Sheets* Decision</u>

Judge Tigar's *Sheets* case is instructive on the issue of principal place of business. *See Sheets v. F. Hoffman La Roche Ltd.*, No. 18-cv-04565-JST, 2018 U.S. Dist. LEXIS 207248 (N.D. Cal. Dec. 7, 2018). This is especially so given that *Sheets* is similar to the instant case – *i.e.*, the plaintiff claimed that he suffered injury after taking Lariam while he was in the military and thus sued FHLR, HLR, and Genentech. HLR and Genentech removed the plaintiff's case from state to federal court, and the plaintiff responded by filing a motion to remand. The plaintiff was represented by the same counsel who represent Mr. Pool here.

Judge Tigar held that the removing defendants (HLR and Genentech) failed to meet their burden of showing that removal was proper: "The Plaintiffs have submitted considerable evidence [such as Roche-branded press releases, internal documents, and public websites] showing that HLR's operational, administrative, and executive functions shifted from New Jersey to California once Roche Holding acquired Genentech in 2009." *Id.* at *6.

Judge Tigar continued: "By contrast, the evidence in support of HLR having its nerve center in New Jersey is both slight and equivocal." *Id.* at *7. Although the removing defendants

> offer[ed] filings before the New Jersey Treasury Department and California Secretary of State, both of which name New Jersey as HLR's principal place of business[,] . . . the Supreme Court has explicitly "reject[ed] suggestions . . . that the mere filing of a form . . . would, without more, be sufficient proof to establish a corporation's 'nerve center.'" Allowing such self-serving allegations to be determinative of jurisdiction "would readily permit jurisdictional manipulation" – for instance, where "the alleged 'nerve center' is nothing more than a mail drop box, [or] a bare office with a computer."

*Id.* at *7-8. As for the fact that board meetings took place in New Jersey, that was not particularly meaningful given that, under Supreme Court law, "the principal place of business is usually '*not* simply an office where the corporation holds its board meetings,' but rather 'the actual center of direction, control, and coordination, i.e., the "nerve center[.]"'" *Id.* at *8-9 (emphasis in original).

Finally, Judge Tigar addressed the defendants' contention that

> "Plaintiff's [e]vidence fails to disprove that HLR is a New Jersey [c]itizen." The argument misses the point. . . . [T]he burden with regard to citizenship rests with HLR, not Plaintiffs. "The strong

18

> presumption against removal jurisdiction means that the defendant
> always has the burden of establishing that removal is proper." And
> any ambiguity in the parties' evidence must be resolved "in favor of
> remand to state court." As set forth above, HLR has not met this
> burden.

*Id.* at *9.

The *Sheets* decision itself is not dispositive here. Mr. Pool does not argue that HLR and

Roche Labs are subject to collateral estoppel because of *Sheets*. In addition, the record being

presented to the Court here appears to be somewhat different from that presented to Judge Tigar in

*Sheets* (although, admittedly, Mr. Pool presents much of the same evidence). Nevertheless, *Sheets*

is instructive on whether the Removing Defendants satisfied their burden of proving the principal

places of HLR and Roche Labs are in Little Falls, New Jersey rather than South San Francisco,

California.

       3.    <u>Nerve Center</u>

As noted above, in *Hertz*, the Supreme Court held that "principal place of business" means

the corporation's nerve center, *i.e.*, "the place where the corporation's high level officers direct,

control, and coordinate the corporation's activities." *Hertz*, 559 U.S. at 80. "[I]n practice," the

nerve center

> should normally be the place where the corporation maintains its
> headquarters – provided that the headquarters is the actual center of
> direction, control, and coordination, . . . and not simply an office
> where the corporation holds its board meetings (for example,
> attended by directors and officers who have traveled there for the
> occasion).

*Id.* at 93 (emphasis added).

In the instant case, where the center of direction, control, and coordination is complicated

by the fact that the high-level officers are not all in one location. *See id.* at 96 (acknowledging

that, "in this era of telecommuting, some corporations may divide their command and coordinating

functions among officers who work at several different locations, perhaps communicating over the

Internet"). This appears to be true for both HLR and Roche Labs.

For HLR, the Removing Defendants have submitted a declaration from HLR's Assistant

Secretary, Gerald Bohm, in which he testifies that the company's acting officers "include" five

persons, four of whom are based in Little Falls, New Jersey, and one of whom is based in Nutley, New Jersey. *See* Bohm Decl. ¶ 15. But this declaration fails to tell the whole story. While the acting officers technically "include" these five people, a declaration that Mr. Bohm submitted in the *Sheets* case makes clear that HLR actually has "seven directors and officers." Creed Decl., Ex. 24 (*Sheets* Bohm Decl. ¶ 6 & Ex. A) (HLR's 2018 Annual Report). And notably, the two people that Mr. Bohm failed to mention in the declaration submitted to this Court are both based in South San Francisco, California – *i.e.*, Sean A. Johnston (Director, Secretary, and Vice President) and Bruce Resnik (Vice President). *See* Creed Decl., Ex. 24 (*Sheets* Bohm Decl., Ex. A).

The Court acknowledges that, when all seven people are considered, the sheer numbers do weigh in favor of Little Falls, New Jersey, over South San Francisco, California (four to two). But sheer numbers are not dispositive. Without an understanding of what each director or officer actually does for HLR as a practical matter, where the nerve center of the company is cannot be determined. For example, if Mr. Johnston and Mr. Resnik were primarily responsible for the direction, control, and coordination of HLR, and the remaining individuals simply played more ancillary roles, then the nerve center would be South San Francisco and not Little Falls. In this regard, the Court takes note that, in a filing HLR made with the state of California, Mr. Johnston is identified as the company's CEO. *See* Creed Dec., Ex. 24 (*Sheets* Bohm Decl., Ex. B) (Statement of Information, filed with the California Secretary of State). His governance role would appear to be highly significant.

That Mr. Bohm states in his declaration that HLR's "decisions are made out of Little Falls," Bohm Decl. ¶ 11, is not sufficient to show that Little Falls is in fact the nerve center of the company. That statement is entirely conclusory in nature. As for Mr. Bohm's statement in his removal declaration that "HLR's corporate activities are run by myself in Little Falls, New Jersey via unanimous consent of HLR's Officers and Directors," Docket No. 1-5 (Bohm Decl. ¶ 6), the Court does not understand this to mean that Mr. Bohm is, in effect, the sole decisionmaker of HLR. Such testimony could not be squared with testimony in his former declaration, indicating that there are other HLR officers who also perform substantive job functions. *See* Bohm Decl. ¶¶ 15-16 (testifying that five of the seven officers "perform[] [their] job functions" in New Jersey).

Nor does it appear to account for the fact that Mr. Johnston, in California, has been identified as the CEO.

As for Roche Labs, the Removing Defendants again rely on the Bohm declaration, wherein Mr. Bohm testifies that the company's acting officers "include" three persons, all based in Little Falls, New Jersey, and one of whom is based in Nutley, New Jersey. *See* Bohm Decl. ¶ 15. But, as above, this declaration is less than forthcoming because it omits Mr. Johnston. And similar to above, Mr. Johnston is listed in a California state filing as the CEO of Roche Labs. *See* Creed Decl., Ex. 25 (Statement of Information, filed with the California Secretary of State).

Given the above doubts about the propriety of removal, the Court finds – as Judge Tigar did in *Sheets* – that a remand is appropriate, more specifically, on the basis that the Removing Defendants failed to meet their burden of proving that the nerve center is in fact Little Falls for HLR and Roche Labs. The Court need not consider whether Mr. Pool should be given jurisdictional discovery to explore the issue of nerve center precisely because it is the Removing Defendants' burden to prove diversity of citizenship and, clearly, the Removing Defendants should have had in their possession, custody, or control information about where the nerve center is for HLR and Roche Labs but failed to produce sufficient persuasive evidence. *See Sheets*, 2018 U.S. Dist. LEXIS 207248, at *9 (finding "Plaintiffs' request for jurisdictional discovery . . . moot" in light of the ruling that the removing defendants failed to meet their burden of proving that removal was proper). *Compare Anwar v. Fairfield Greenwich, Ltd.*, No. 09 Civ. 0118 (VM) (THK), 2009 U.S. Dist. LEXIS 37077, at *17 (S.D.N.Y. May 1, 2009) (granting defendants discovery with respect to information about *plaintiffs* because defendants "have demonstrated that 'a more satisfactory showing of the facts' will aid the District Court in ascertaining jurisdiction").

E.     Attorney's Fees and Costs

For the reasons stated above, the Court grants Mr. Pool's motion to remand. The only question remaining is whether Mr. Pool is entitled to attorney's fees and costs. *See* 28 U.S.C. § 1447(c) ("An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."). In the exercise of its discretion, the Court denies the request for fees and costs. Although the Court is remanding the case back to state

court, the removal of the case was not frivolous. *See SWC Inc. v. Elite Promo Inc.*, 234 F. Supp. 3d 1018, 1026 (N.D. Cal. 2017) (indicating that fees may be denied where the defendant took a position that was not frivolous).

### III.    CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** the motion to remand.

The Clerk of the Court is ordered to remand the case back to state court and close the file in the case.

This order disposes of Docket No. 31.


**IT IS SO ORDERED**.


Dated: May 7, 2019

_____
EDWARD M. CHEN
United States District Judge